IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT ~~FILED~~

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK ACCOUNT "GWAP GETTA,"
OR WITH TELEPHONE #860-394-5218,
THAT IS STORED AT PREMISES
CONTROLLED BY FACEBOOK INC.

Case No. _____

318 mj 1899 (RMS)

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jay Salvatore, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain Facebook user ID that is stored at premises owned,

maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking

company headquartered in Menlo Park, California.  The information to be searched is described

in the following paragraphs and in Attachment A.  This affidavit is made in support of an

application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to

require Facebook to disclose to the government records and other information in its possession,

pertaining to the subscriber or customer associated with the user ID.

2.      I am employed as a Special Agent with the Drug Enforcement Administration

("DEA") and have been so employed since December 2004.

3.      I am currently assigned to the DEA Hartford Resident Office ("HRO").  I have

attended and successfully completed the Drug Enforcement Administration's Basic Agent

Training School.  In addition, I have attended other specialized drug training schools conducted

by the DEA; have testified on several occasions in grand jury proceedings, where my testimony

has contributed to the indictment of numerous individuals; have been involved with the execution of state and federal search and seizure warrants where controlled substances have been seized; have participated in several investigations in which federally authorized wire interception orders were issued; and I have participated in numerous arrests of individuals charged with federal and/or state narcotics violations.  I am currently assigned to conduct drug and money laundering investigations at the DEA's HRO.

4.      In my current position with the DEA HRO, my duties include investigating violations of the Connecticut General Statutes and the Controlled Substances Act, including, but not limited to, investigating those drug traffickers and organizations responsible for diverting and distributing pharmaceuticals and other drugs within the State of Connecticut.  Due to the abuse and trafficking of opioid-based pharmaceutical pills and the correlated abuse and trafficking of heroin and fentanyl, the DEA HRO is also actively conducting investigations into individuals and organizations involved with the distribution of heroin and fentanyl.

5.      Prior to being employed by the DEA, I was a sworn Police Officer in the Town of Wethersfield, Connecticut for approximately three and a half years.  As a certified Police Officer in the State of Connecticut, this Affiant conducted numerous investigations of violations of the law, including narcotics violations.

6.      This Affiant has directed and coordinated electronic surveillance, controlled purchases of drugs, physical surveillance, and undercover activities as well as debriefed and managed confidential sources.  This Affiant is familiar with the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their illegal drugs.

7.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to

conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. This affidavit relates to an investigation, in which I have been involved, of an overdose death that occurred in Enfield, Connecticut on or about Sunday, October 8, 2017. In particular, I am investigating violations of 21 U.S.C. § § 841(a)(1) and (b)(1)(C) (possession with intent to distribute and the distribution of, heroin and fentanyl).

8.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.     As described in more detail below, based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § § 841(a)(1) and (b)(1)(C) (possession with intent to distribute and the distribution of, heroin and fentanyl) were committed by Christopher FELICIANO through the use of his Facebook Account "GWAP GETTA") and specifically through Facebook Instant messenger.[1] Accordingly, there is probable cause to search the information described in Attachment A, incorporated by reference in this affidavit, for evidence of these crimes, as described in Attachment B, incorporated by reference in this affidavit.

## PROBABLE CAUSE

**Background Investigation**

10.     On October 8, 2017, at approximately 8:55 a.m., EPD Officer Maynard was

---

[1] On November 14, 2018, a grand jury sitting in Hartford returned an Indictment charging Christopher FELICIANO with Possession with intent to distribute and distribution of heroin and fentanyl from February 2017 to October 8, 2017. *See United States v. Feliciano*, 18CR287(SRU)

dispatched to a residence in Enfield, Connecticut on a report of an untimely death. Upon arriving at the scene, Officer Maynard was told by the VICTIM's father, hereinafter referred to as "WITNESS #1," that the VICTIM was in the basement and not breathing. Enfield EMS Paramedic Brian Brady arrived at the scene and pronounced the VICTIM deceased at approximately 9:07 a.m. The VICTIM's body was later identified by WITNESS #1 and the VICTIM's driver's license picture was used to confirm identification.

11.     When the VICTIM was rolled over onto his back, Detective Bailey observed a white powdery substance on the front of the VICTIM's sweat pants. Located in the VICTIM's front left pant pocket was a black LG cell phone, which was later determined to be the VICTIM's cell phone and drug related paraphernalia—all of which were seized as evidence by the EPD. On November 7, 2017, Dollett T. White, M.D. Associate Medical Examiner, Office of the Chief Medical Examiner, State of Connecticut issued a report, following the autopsy of the VICTIM conducted on October 09, 2017. This report listed the VICTIM's cause of death as "Multidrug toxicity including Fentanyl and Alprazolam."

12.     Upon returning to the Enfield Police Department, EPD Detective Lewis conducted an analysis of the VICTIM's phone seized at the scene. In the process, Detective Lewis discovered a Facebook Instant Messenger conversation between the VICTIM and an individual with a "handle" of "GWAP GETTA." The conversation had numerous references to indicate that an illegal drug deal had taken place in the early morning hours of October 8, 2017. During the above Facebook conversation, the following number was provided to the VICTIM by "GWAP GETTA": 860-394-5218. DEA TFO Chaves, who is also a Computer Forensics Specialist, conducted a forensic examination of exhibit N-592 and was able to extract all data contained therein.

4

## CELLULAR TELEPHONE ANALYSIS

13.     Upon examination of the data extracted from the cellular telephone found at the scene, this Affiant located the previously noted Facebook Instant Message conversation between the VICTIM and "GWAP GETTA."  In further examination of the data, this Affiant located approximately 70 Facebook Messenger instant messages between the VICTIM and "GWAP GETTA" beginning on February 16, 2017 and ending on October 8, 2017, the day the VICTIM was found deceased.  Based upon training and experience, this Affiant determined that most, if not all of the messages, were consistent with the trafficking of illegal drugs and specifically, heroin and fentanyl.

14.     This Affiant also located the message in which "GWAP GETTA" provided phone number: 860 394 5218, to the VICTIM.  In addition, there were approximately fourteen phone contacts between the VICTIM's phone and number: 860 394 5218.  On April 8, 2018, in response to an Administrative Subpoena served by members of the DEA, Sprint returned the requested information that listed during the date range of October 1, 2017 – November 1, 2017, the billing information assigned to phone number 860 394 5218 listed the subscribe as Christopher FELICIANO of 33 Asnuntuck Street, Enfield, CT, 06082.

15.     The following are portions of the Facebook Messenger conversation between GWAP GETTA a.k.a. FELICIANO and the VICTIM on February 16, 2017, the first day of communications that were extracted from the VICTIM's phone.

> #2: 02-16-17, 07:55:24 AM, GWAP GETTA: Way u needed
>
> #3: 02-16-17, 07:55:52 AM, VICTIM: My boy needs some bags for 100 I was gonna try to pc a couple
>
> #4: 02-16-17, 07:56:11 AM, VICTIM: I'm in long meadow u headed to

spfld [Springfield] this morning

#5: 02-16-17, 07:56:19 AM, VICTIM: Cuz he in spfld

#6: 02-16-17, 07:56:44 AM, VICTIM: N I'm tryna off this engagement

ring but I don't got my id but it's worth some good bread

#7: 02-16-17, 07:57:21 AM, GWAP GETTA: I want that or nah

#8: 02-16-17, 07:57:31 AM, VICTIM: What?

#9: 02-16-17, 07:57:46 AM, VICTIM: Yeah I'm sure he still needs it wya

[Where you at]

#10: 02-16-17, 07:58:37 AM, GWAP GETTA: Call me

#11: 02-16-17, 08:02:32 AM, FELICIANO missed a call from the

VICTIM

#12: 02-16-17, 08:02:42 AM, VICTIM: I tried

#13: 02-16-17, 08:03:50 AM, VICTIM: Fck

#14: 02-16-17, 09:20:20 AM, VICTIM: U comin

#15: 02-16-17, 09:31:42 AM, VICTIM: Str8 snake

16.     Based upon training and experience, this Affiant believes that although this was the first extracted conversation from the VICTIM's phone, it was not the first conversation between the VICTIM and FELICIANO.  Accordingly, there are likely to be more such conversations on FELICIANO's "GWAP GETTA" Facebook Account.  In message #2, FELICIANO wrote: "Way u needed", your affiant believes that FELICIANO was attempting to ask what the VICTIM wanted to purchase.  This is based upon the VICTIM's immediate response in message #3. Within that message, the VICTIM wrote, "My boy needs some bags for 100." This Affiant believes that the VICTIM was referencing illegal drugs, and specifically

heroin and/or fentanyl, when he wrote "bags" and the reference to "100," means that the VICTIM's "boy" (friend) had a hundred dollars to spend.  In message #6, the VICTIM texted "N I'm tryna off this engagement ring but I don't got my id but it's work some good bread."  Within this message, the VICTIM is telling FELICIANO that he was trying to sell an engagement ring to obtain money, which this Affiant believes would be used to purchase illegal drugs in the near future.  This Affiant believes that the remaining messages from that day related to attempts to arrange the illegal drug transaction.  This conversation was conducted over Facebook messenger—thus demonstrating that FELICIANO's GWAP GETTA Facebook account was used as a means of coordinating illegal narcotics transactions.

17.     After February 16, 2017, and until June 23, 2017, there were no further recovered communications between the VICTIM and FELICIANO.  The following is the Facebook Messenger conversation that occurred between the VICTIM and FELICIANO on June 23, 2017 and June 24, 2017:

> #16: 06-23-17, 09:44:39 AM, GWAP GETTA: Yo
>
> #17: 06-23-17, 02:24:24 PM, VICTIM: Sup
>
> #18: 06-24-17, 08:38:51 PM, GWAP GETTA: Got loose
>
> #19: 06-24-17, 10:03:54 PM, VICTIM: I don't do dope no more
>
> #20: 06-24-17, 10:08:11 PM, GWAP GETTA: Don't know what that izzz lol (laugh out loud)
>
> #21: 06-24-17, 10:31:36 PM, VICTIM: me eitha

18.     Within this short conversation, this Affiant believes that FELICIANO was attempting to make contact with the VICTIM to sell the VICTIM illegal drugs.  In message #18, FELICIANO texted, "Got loose."  Based upon training and experience, this Affiant believes that

FELICIANO was telling the victim that he had illegal drugs in the powder form to sell. The

VICTIM responded with, "I don't do dope no more" in message #19.  This Affiant knows that

"dope" is commonly used to reference heroin.  This brief conversation corroborates what

WITNESS #1 originally told police regarding how he thought the VICTIM was "clean" for

approximately six (6) months before the fatal overdose.  Again, this conversation was conducted

over Facebook messenger demonstrating that the two used Facebook messenger to discuss

narcotics trafficking.  Because GWAP GETTA a.k.a. FELICIANO reached out to the VICTIM

over Facebook in an attempt to advertise his product (heroin/fentanyl), based on my training and

experience, I have reason to believe and do believe that he also likely reached out to other

narcotics customers over Facebook using his GWAP GETTA account.

19.     The following is the conversation between the VICTIM and FELICIANO

extracted from Facebook Messenger and the VICTIM's phone timeline to include text messages

and the call log. Most if not the entire conversation contains references to an illegal drug

transaction and arrangements for a transaction to occur.

> #22: 10-07-17, 11:44:57 PM, VICTIM: Yo
>
> #23: 10-07-17, 11:45:25 PM, VICTIM: U gud
>
> #24: 10-07-17, 11:58:44 PM, GWAP GETTA: Always
>
> #25: 10-07-17, 11:58:53 PM, GWAP GETTA: U?
>
> #26: 10-08-17, 12:00:20 AM, VICTIM: I need some thAt goodness

20.     Within the above messages, the VICTIM is attempting to make contact with

FELICIANO as well as asking FELICIANO if he has any illegal drugs to sell, as documented in

message #23, when the VICTIM texted, "U gud" (you good).  FELICIANO responds with

"Always", indicated that FELICIANO always has product to sell.  Within message #26, the

VICTIM texted, "I need some thAt goodness", indicating that the VICTIM wanted to buy illegal drugs from FELICIANO.  It should be noted that the below message numbers changed because the following conversation was extracted from the VICTIM's phone timeline, not just from Facebook Messenger.

> #20: 10-08-17, 12:04:54 AM, VICTIM: U in spfld or enfld
>
> #21: 10-08-17, 12:05:03 AM, GWAP GETTA: Field
>
> #22: 10-08-17, 12:05:16 AM, VICTIM: Enfield
>
> #23: 10-08-17, 12:05:27 AM, GWAP GETTA: Got (followed by four (4) fire emojis)
>
> #24: 10-08-17, 12:05:30 AM, VICTIM: Is were in at
>
> #25: 10-08-17, 12:05:36 AM, GWAP GETTA: Yea
>
> #26: 10-08-17, 12:05:50 AM, GWAP GETTA: U gotta be really careful

21.    Within message #23, FELICIANO told the VICTIM that he had "fire" by texting the VICTIM four (4) fire emojis.  As previously documented, this Affiant knows "fire" is commonly used to reference Fentanyl.  This is further confirmed in message #26, when FELICIANO texted "U gotta be really careful".  This text also confirmed that FELICIANO knows how potent and dangerous the product he is selling is.

> #27: 10-08-17, 12:06:17 AM, VICTIM: Aight bruh. What's the least
>
> #28: 10-08-17, 12:06:29 AM, VICTIM: I don't want much
>
> #29: 10-08-17, 12:06:36 AM, VICTIM: But will pay
>
> #30: 10-08-17, 12:07:16 AM, VICTIM: I'll tip if u could bring to atm up
>
> #31: 10-08-17, 12:08:19 AM, GWAP GETTA: Damn bro
>
> #33: 10-08-17, 12:08:33 AM, GWAP GETTA: That's extra n it's late n u

might

#34: 10-08-17, 12:08:38 AM, GWAP GETTA: OD

#35: 10-08-17, 12:08:48 AM, GWAP GETTA: Fire like that

#36: 10-08-17, 12:08:50 AM, VICTIM: Nah bruh

#37: 10-08-17, 12:09:07 AM, VICTIM: Ima shus smoke a bag

#38: 10-08-17, 12:09:16 AM, VICTIM: See what that's aboyt

22.     Within the above messages, the VICTIM first told FELICIANO that he did not

want that much but would pay and would pay extra if FELICIANO brought the VICTIM to an

ATM.  FELICIANO responded by informing the VICTIM that because it was late, it was going

to cost more.  Within the same message, message #33, FELICIANO added "u might" followed

by "OD" in the next message.  FELICIANO continued in message #35 with, "Fire like that."

This Affiant believes that within these messages, FELICIANO again recognized how potent and

dangerous his product was.  The VICTIM responded in messages #37 and #38 that he was only

going to smoke one bag. In message #38, the VICTIM texted, "See what that's aboyt". This

Affiant believes that within this message, the VICTIM after receiving the warning, wanted to

experiment with it.  The conversation continued with negotiations regarding an illegal drug

transaction.

#39: 10-08-17, 12:09:25 AM, VICTIM: Ill cop a b

#40: 10-08-17, 12:09:42 AM, GWAP GETTA: Late baby cop 2

#41: 10-08-17, 12:10:00 AM, GWAP GETTA: N it's loose

#42: 10-08-17, 12:10:34 AM, VICTIM: Ought so wassup u wanna make

this happen com to 29 Colonial

#43: 10-08-17, 12:10:47 AM, VICTIM: Enfd

#44: 10-08-17, 12:10:58 AM, VICTIM: Ill take a 30 or 40

#45: 10-08-17, 12:11:18 AM, GWAP GETTA: 80 or better

#46: 10-08-17, 12:11:31 AM, VICTIM: I ain't got it fam

#47: 10-08-17, 12:11:35 AM, VICTIM: I got 40

#48: 10-08-17, 12:12:01 AM, VICTIM: Mi got some loud too

#49: 10-08-17, 12:12:01 AM, GWAP GETTA: It's late 12 out here

#50: 10-08-17, 12:12:33 AM, VICTIM: Yeah but I aint gone want it tomo

#51: 10-08-17, 12:12:36 AM, GWAP GETTA: Day time I don't mind that risk

#52: 10-08-17, 12:12:54 AM, VICTIM: Lets do this

#53: 10-08-17, 12:13:00 AM, VICTIM: Ill go to atm myself

#54: 10-08-17, 12:13:04 AM, GWAP GETTA: 50

#55: 10-08-17, 12:13:10 AM, VICTIM: Ok

#56: 10-08-17, 12:18:24 AM, VICTIM: What's ur num

#57: 10-08-17, 12:18:37 AM, GWAP GETTA: 8603945218

23.     The above portion of the conversation documents the actual negotiations for the illegal drug transaction between FELICIANO and the VICTIM.  Within message #39, the VICTIM told FELICIANO what the VICTIM would like to purchase by texting "Ill cop a b". Based upon training and experience, this Affiant knows that "b" is commonly used to reference a "bundle" (10 wax bags).  Heroin/ Fentanyl is commonly packaged for sale in bundles. FELICIANO again made reference to the time and how late it was stating that the VICTIM would have to buy two (2) bundles in message #40 when FELICIANO texted, "Late baby cop 2". Within message #41, FELICIANO texted the VICTIM "N it's loose", this Affiant believes

this to mean that FELICIANO only had loose powder that he would sell which had not been packaged in the smaller bags or bundles.  The conversation further continued with FELICIANO and the VICTIM negotiating dollar amounts and how much the VICTIM could spend. Within message #44, the VICTIM texted, "Ill take a 30 or 40."  FELICIANO immediately responds with, "80 or better" in message #45.  Within the next few message the VICTIM told FELICOANO that he did not have the money as negotiations continued.  In messages #49 - #51, FELICIANO acknowledged that was concerned about doing the deal due to the late hour.  In response, the VICTIM apparently attempted to convince FELICIANO to do the deal when the VICTIM texted, "Yeah but I aint gone want it tomo". FELICIANO and the VICTIM subsequently agreed on the price of "50", which was followed by the VICTIM asking FELICIANO for his phone number. FELICIANO responded in message #57 with "8603945218". At approximately 12:20 a.m., the VICTIM places a call to FELICIANO, using the phone number provided (860 394 5218) that lasted approximately 1:19 minutes. The next contact between the VICTIM and FELICIANO occurred approximately twelve (12) minutes later when the victim texted (SMS messages to 860 394 5218) the following to FELICIANO:

> #78: 10-08-17, 12:32:27, AM, VICTIM: Yo ill be st that atm soon. Then
>
> ill be on the side street by my dads crib
>
> #79: 10-08-17, 12:32:48 AM, VICTIM: Close to the atm
>
> #80: 10-08-17, 12:32:56 AM, VICTIM: Bring change for 60

24.     Approximately eight (8) minutes later, the VICTIM placed a phone call to FELICIANO that lasted approximately thirty (30) seconds.  This call was followed by the below text messages from the VICTIM, approximately four (4) minutes later.

> #97: 10-08-17, 12:44:38 AM, VICTIM: At atm nimow

#98: 10-08-17, 12:45:29 AM, VICTIM: The one we use to go to

25.      Over the next hour or so, the VICTIM attempted to call FELICIANO multiple

times.  Each call either lasted a very short time or went unanswered.  At approximately 1:35

a.m., the VICTIM received a text message from WITNESSS #1, which revealed that the

VICTIM was still out of the house. Shortly thereafter, FELICIANO attempted to call the

VICTIM four (4) times, which appeared to have gone unanswered. The last contact recovered

was at approximately at 1:41 a.m., when the VICTIM placed a call to FELICIANO that lasted

01:40 minutes.  Based upon the fact that there was no further contact between FELICIANO and

the VICTIM, this Affiant believes that the two had met and conducted an illegal drug

transaction.

26.      These conversations over Facebook messenger demonstrate that "GWAP

GETTA" used Facebook messenger to coordinate his narcotics trafficking activities.  As

previously noted, these are only a sampling of the recovered narcotics related Facebook

messages.  Based on my experience and information gained throughout the course of this

investigation, I have reason to believe and do believe that FELICIANO/GWAP GETTA used

Facebook messenger to arrange and carry out his narcotics trafficking and that he likely used

Facebook to coordinate with other individuals as well.  Searching his Facebook account from

February to October 2017, when we know that FELICIANO  was selling narcotics to at least one

individual in this case (the VICTIM) by using Facebook is likely to provide further evidence of

narcotics trafficking.  Moreover, there is also likely to be evidence of FELICIANO conducting

narcotics trafficking on his GWAP GETTA account with other customers.

27.      As discussed further below, information stored within FELICIANO's Facebook

account may provide critical information of the "who, what, why, when, where, and how" of the

criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

## IDENTIFICATION OF CHRISTOPHER FELICIANO

28.     During the initial stages of this investigation, and as previously documented, EPD Detectives seized numerous items including the VICTIM's cell phone, subsequently labeled DEA non-drug exhibit N-592.  All seized items were subsequently transported to the Enfield Police Department.  At the EPD, Detective Lewis conducted an analysis of the VICTIM's phone and discovered a Facebook Messenger conversation between the VICTIM and individual with a "handle" of "GWAP GETTA".  The conversation had numerous references to indicate that an illegal drug deal had taken place in the early morning hours of October 8, 2017.  During the above Facebook conversation, the following number was provided to the VICTIM by "GWAP GETTA": 860 394 5218.  EPD Detective Bailey then conducted a Facebook search using phone number 860 394 5218, which resulted in the Facebook profile under the name of "GWAP GETTA".  The profile also contained numerous photos of a Hispanic male.  After observing the photos, Detective Bailey, with the assistance of other members of the EPD, recognized the male to be Christopher FELICIANO.  Based upon my review of Facebook it appears that FELICIANO started his GWAP GETTA account in 2009 and based on my training and experience, I believe that FELICIANO likely used this account as he would have used a "drug phone" or an extra phone to communicate primarily with narcotics customers.

30.     Based  on these transactions and my knowledge of how Facebook messenger works and how it can be used to coordinate narcotics transactions, I have reason to believe and do believe that further evidence of FELICIANO's narcotics trafficking activities is likely to be found on Facebook.  Aside from conversations on Facebook Messenger, as discussed in more

detail below, I believe that other information that may be found on FELICIANO's GWAP

GETTA Account or any account with telephone number 860-394-5218, will contain further

evidence of FELICIANO's narcotics trafficking activities.  For example, FELICIANO's contacts

on that account and posts may provide further evidence on the extent of his drug sales, his

sources of supply and his customers.

## INFORMATION SOUGHT

31.     Facebook owns and operates a free-access social networking website of the same

name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news,

photographs, videos, and other information with other Facebook users, and sometimes with the

general public.

32.     Facebook asks users to provide basic contact and personal identifying information

to Facebook, either during the registration process or thereafter.  This information may include

the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical

address (including city, state, and zip code), telephone numbers, screen names, websites, and

other personal identifiers.  Facebook also assigns a user identification number to each account.

33.     Facebook users may join one or more groups or networks to connect and interact

with other users who are members of the same group or network.  Facebook assigns a group

identification number to each group.  A Facebook user can also connect directly with individual

Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request"

accepts the request, then the two users will become "Friends" for purposes of Facebook and can

exchange communications or view information about each other.  Each Facebook user's account

15

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

34.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link

to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

37.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

38.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

39.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.  Facebook

17

also has a Marketplace feature, which allows users to post free classified ads.  Users can post

items for sale, housing, jobs, and other items on the Marketplace.

        40.      In addition to the applications described above, Facebook also provides its users

with access to thousands of other applications ("apps") on the Facebook platform.  When a

Facebook user accesses or uses one of these applications, an update about that the user's access

or use of that application may appear on the user's profile page.

        41.      Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP

address.  These logs may contain information about the actions taken by the user ID or IP

address on Facebook, including information about the type of action, the date and time of the

action, and the user ID and IP address associated with the action.  For example, if a user views a

Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and

would show when and from what IP address the user did so.

        42.      Social networking providers like Facebook typically retain additional information

about their users' accounts, such as information about the length of service (including start date),

the types of service utilized, and the means and source of any payments associated with the

service (including any credit card or bank account number).  In some cases, Facebook users may

communicate directly with Facebook about issues relating to their accounts, such as technical

problems, billing inquiries, or complaints from other users.  Social networking providers like

Facebook typically retain records about such communications, including records of contacts

between the user and the provider's support services, as well as records of any actions taken by

the provider or user as a result of the communications.

        43.      As explained herein, information stored in connection with a Facebook account

may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

conduct under investigation, thus enabling the United States to establish and prove each element

or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a

Facebook user's IP log, stored electronic communications, and other data retained by Facebook,

can indicate who has used or controlled the Facebook account.  This "user attribution" evidence

is analogous to the search for "indicia of occupancy" while executing a search warrant at a

residence.  For example, profile contact information, private messaging logs, status updates, and

tagged photos (and the data associated with the foregoing, such as date and time) may be

evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook

account activity can show how and when the account was accessed or used.  For example, as

described herein, Facebook logs the Internet Protocol (IP) addresses from which users access

their accounts along with the time and date.  By determining the physical location associated

with the logged IP addresses, investigators can understand the chronological and geographic

context of the account access and use relating to the crime under investigation.  Such information

allows investigators to understand the geographic and chronological context of Facebook access,

use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-

location into some of its services.  Geo-location allows, for example, users to "tag" their location

in posts and Facebook "friends" to locate each other.  This geographic and timeline information

may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account

activity may provide relevant insight into the Facebook account owner's state of mind as it

relates to the offense under investigation.  For example, information on the Facebook account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort

to conceal evidence from law enforcement).

44.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

45.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B. The search warrant will be served on Facebook, which will then compile the requested records at a time convenient to it and in the ordinary course of its business.  Accordingly, reasonable cause exists to permit execution of the search warrant at any time in the day or night.

### CONCLUSION

46.     Based on the forgoing, I request that the Court issue the proposed search warrant.

47.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a district court of the United States and has jurisdiction over the offense being investigated.

48.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Special Agent Jay Salvatore
Drug Enforcement Administration

Subscribed and sworn to before me on _November 20_____, 201_8_

/s/ Robert M. Spector
ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with Facebook User Account "GWAP GETTA" or with telephone # 860-394-5218, that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.**     **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including for  Facebook User Account "GWAP GETTA" or with telephone # 860-394-5218, that is stored at premises controlled by Facebook. full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **February 2017 to October 2017**;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from **February 2017 to October 2017**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including

the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from **February 2017 to October 2017** including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from **February 2017 to October 2017** All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

2

(n)     The length of service (including start date) and the means and source of any

payments associated with the service (including any credit card or bank account

number);

(o)     All privacy settings and other account settings, including privacy settings for

individual Facebook posts and activities, and all records showing which Facebook

users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person

regarding the user or the user's Facebook account, including contacts with support

services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within

fourteen days of service of this warrant.

II.     **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) involving FELICIANO from February to October 2017 including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Sale of illegal drugs, discussion of illegal drugs, communications regarding the proceeds of the sale of illegal drugs, all communications with drug customers.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC</u>
## <u>RECORDS PURSUANT TO FEDERAL RULES OF</u>
## <u>EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct.  I am employed by Facebook, and my title is

_____.  I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved.  I state

that the records attached hereto are true duplicates of the original records in the custody of

Facebook.  The attached records consist of _____ .  I further state that:

a.      all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of Facebook, and they were made by Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or system that

produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or

file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the

original records; and

2.      the process or system is regularly verified by Facebook, and at all times

pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                          Signature